# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| MARCIA GREEN and AUSTEN SWAIM, on Behalf of Themselves and All Others Similarly Situated, | ) ) ) | Case No. _____ |
| | ) | |
| Plaintiffs, | ) ) | CLASS ACTION |
| | ) ) | COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND VIOLATIONS |
| v. | ) ) ) | OF §14(a) AND §20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 14a-9 OF THE U.S. SECURITIES AND |
| LAWSON SOFTWARE, INC., HARRY DEBES, H. RICHARD LAWSON, ROMESH WADHWANI, DAVID R. HUBERS, MICHAEL A. ROCCA, STEVEN C. CHANG, PAUL WAHL, PETER GYENES, ROBERT A. SCHRIESHEIM, GGC SOFTWARE HOLDINGS, INC., ATLANTIS MERGER SUB, INC., GOLDEN GATE CAPITAL, and INFOR GLOBAL SOLUTIONS, INC., | ) ) ) ) ) ) ) ) ) ) ) ) | EXCHANGE COMMISSION PROMULGATED THEREUNDER |
| | ) ) | |
| Defendants. | ) ) | DEMAND FOR JURY TRIAL |
| _____ | ) | |

## SUMMARY OF THE ACTION

1.      Plaintiffs bring this shareholder class action both for themselves and on behalf of all similarly situated holders of common stock of Lawson Software, Inc. ("Lawson" or the "Company") against Lawson, GGC Software Holdings, Inc. ("GGC"), Atlantis Merger Sub, Inc. ("Atlantis"), Golden Gate Capital, Infor Global Solutions, Inc. ("Infor"), and certain of Lawson's officers and directors.  This action arises out of defendants' violations of state law and §14(a) and §20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder in connection with their attempts to sell Lawson to GGC, an affiliate of Golden Gate Capital and Infor, at an unfair price of $11.25 per share via an unfair process (the "Proposed Acquisition").  Further, as part of their efforts to seek shareholder approval of the Proposed Acquisition, the defendants have filed with the SEC a false and materially misleading Form 14A Definite Proxy Statement (the "Proxy").

2.      In pursuing the unlawful plan to sell the Company via an unfair process and at an unfair price, each of the defendants violated applicable law by directly breaching and/or aiding the other defendants' breaches of their fiduciary duties of loyalty and due care, as well as federal securities laws.  This action seeks to enjoin the Individual Defendants (as defined herein) from further breaching their fiduciary duties in their pursuit of a sale of the Company and from seeking shareholder approval of the Proposed Acquisition without disclosing all material information in the Proxy to Lawson shareholders in violation of §14(a) and §20(a) of the Exchange Act.

3.      Founded in 1975, Lawson is one of the pioneers of the enterprise resource planning software market. Essentially, the Company's software helps with human resources, payroll, accounting, supply chain, and business intelligence. Such technology is critical to customers and often means long-term relationships.  The result of the long-term relationships is recurring maintenance income, which leads to high margins and increased profits.

4.      Recently, the Company has been enjoying the results of its prior restructuring efforts in the form of significant margin expansion and record earnings per share growth.  Lawson's recent performance has lead to the creation of significant cash reserves which the acquiring parties are

- 1 -

using to finance part of the Proposed Acquisition.  Moreover, on February 15, 2011, Brian Murphy ("Murphy"), an analyst with Sidoti & Company, LLC, had Lawson shares valued at a price of $13 per share, well-above the $11.25 per share being offered in the Proposed Acquisition.  GGC's offer of $11.25 per share is also a 2.5% discount from the Company's closing price the day before the Proposed Acquisition was formally announced by the Company.  Moreover, the Company's stock has seen a steady rise since February 2010, when it traded around $6 per share.

5.      As a result of this recent strong performance, there has been speculation that the Company would receive offers to be acquired.  There are numerous potential suitors for a strong technology company like Lawson, including, Oracle Corp. ("Oracle"), SAP AG ("SAP"), Hewlett-Packard Co. ("HP"), International Business Machines Corp. ("IBM"), and Microsoft Corp. ("Microsoft").  As such, prior to approving any acquisition proposals for the Company, the Board of Directors (the "Board") should have duly exercised its fiduciary duties owed to Lawson's shareholders by exploring alternative proposals and reaching out to these and all other potential strategic and financial suitors in order to maximize shareholder value.

6.      Despite the availability of many potential suitors, on March 11, 2011, the Company issued a press release disclosing that it had received an acquisition proposal for $11.25 per share from GGC and its affiliates.  The market agreed that the $11.25 per share offer undervalued the Company as the stock price traded above $12 per share on March 14, 2011, shortly after the Company announced the offer from Golden Gate Capital and Infor.  In fact, less than a month ago, on April 25, 2011, the Company's stock price closed at $12.13 – over $0.85 more than Infor and Golden Gate Capital's per share offer price.  Shockingly, the $11.25 in proposed consideration represents a discount of over 7% to Lawson's closing stock price prior to the announcement of the Proposed Acquisition.  In contrast, premiums in comparable acquisitions announced within the last twelve months have averaged more than triple what Lawson shareholders will receive should the Proposed Acquisition be consummated.  The inadequacy of the offer price is further supported by the analyses conducted by the Company's own financial advisor, Barclays Capital ("Barclays").  For example, Barclays's comparable premiums and selected precedent transaction analyses valued

- 2 -

Lawson shares at upwards of $14.50 and $13, respectively – prices well above the $11.25 offer from Infor and Golden Gate Capital.

7.      On a relative basis, the valuation being offered in the Proposed Acquisition is lower than the recently announced acquisition of competitor Epicor Software Corporation ("Epicor") that was valued at 14.5x next twelve months adjusted EBITDA, which is reflective of Epicor's recent strong overall license revenue growth.  Lawson's acquisition valuation is lower than the 12x – 13x FY2012 adjusted EBITDA that was expected given the Company's strong margin expansion in its M3 business segment that would be fully realized in FY2012.

8.      The Proposed Acquisition is also the product of a flawed process designed to ensure the sale of Lawson to GGC on terms preferential to certain Lawson directors, GGC, Infor, and Golden Gate Capital, but detrimental to plaintiffs and the other public stockholders of Lawson.  For example, activist investor Carl Icahn ("Icahn") recently called for the officers and directors of Lawson to take steps to maximize shareholder value.  Icahn acquired an 8.5% stake in Lawson as of May 11, 2010, and planned to discuss the Company's business and operations with Lawson management.  Rather than maximize shareholder value as a standalone company, the Board is attempting to sell the Company now so as to prevent Icahn from potentially using his significant stake in Lawson as a means of attempting to oust management.  If the Proposed Acquisition is approved, management will be able to retain their positions with the go-forward company and successfully avoid any possible attempt to replace them by Icahn and the other shareholders who are unhappy with their stewardship.

9.      The Board further breached its fiduciary duties in an effort to ensure the Proposed Acquisition is completed by agreeing to preclusive deal protection devices in connection with the Agreement and Plan of Merger the Company and GGC Software entered into on April 26, 2011 (the "Merger Agreement").  These provisions, which collectively preclude any competing offers for the Company, include: (i) a termination fee of $57.5 million payable to GGC if the Company accepts a superior proposal; (ii) a no-solicitation provision prohibiting the Company from properly shopping itself in order to attain the maximum consideration for its shareholders despite numerous potential

suitors; (iii) matching rights, which allows GGC four business days to match any offer (which would have to be unsolicited in light of the no-solicitation clause) that is superior to the proposed consideration; and (iv) a voting agreement whereby certain executives who own 9% of the Company stock have agreed to vote in favor of the Proposed Acquisition.

10.     Finally, the Individual Defendants disloyally placed their own interests before those of the shareholders of Lawson by tailoring the terms and conditions of the Proposed Acquisition to meet their own personal needs and objectives.  For example, certain Individual Defendants are set to receive lucrative change-in-control benefits and/or positions at the post-Proposed Acquisition company.  In fact, the Merger Agreement specifically notes that the officers and directors of the Company will continue as officers and directors of the go-forward entity immediately following consummation of the Proposed Acquisition.

11.     In an attempt to secure shareholder approval for the unfair Proposed Acquisition, on May 31, 2011, the Individual Defendants and Lawson filed with the Securities Exchange Commission and disseminated to Lawson Shareholders, the materially false and misleading Proxy. The Proxy, which recommends that Lawson shareholders vote in favor of the Proposed Acquisition, omits and/or misrepresents material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Acquisition, and the actual intrinsic value of the Company.  Among other information, the Proxy omits and/or misrepresents material information in contravention of §14(a) and §20(a) of the Exchange Act regarding the fairness opinion provided by Lawson's financial advisor, Barclays, including the data and inputs underlying their valuation analyses.

12.     As explained herein, the foregoing information is material to the impending decision of Lawson's shareholders whether or not to vote in favor of the Proposed Acquisition.  As such, defendants' violations of §14(a) and §20(a) of the Exchange Act threaten shareholders with irreparable harm for which money damages are not an adequate remedy.  Thus, plaintiffs seek injunctive relief to ensure that defendants cure their violations of fiduciary duty and §14(a) and

§20(a) of the Exchange Act before Lawson's shareholders are asked to vote on the Proposed Acquisition.

13.     To remedy the Individual Defendants' breaches of fiduciary duty and other misconduct, plaintiffs seek, inter alia: (i) injunctive relief preventing consummation of the Proposed Acquisition, unless and until the Company adopts and implements a procedure or process to obtain a transaction that provides the best possible terms for shareholders, and defendants disclose all material information concerning the Proposed Acquisition to Lawson shareholders; (ii) a directive to the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of Lawson's shareholders; and (iii) rescission of, to the extent already implemented, the Merger Agreement or any of the terms thereof.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over all claims asserted herein pursuant to §27 of the Exchange Act for violations of §14(a) and §20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331.

15.     Venue is proper in this District because Lawson has its principle place of business in this District.  Plaintiffs' claims arose in this District, where most of the actionable conduct took place, where most of the documents are electronically stored and where the evidence exists, and where virtually all the witnesses are located and available to testify at the jury trial permitted on these claims in this Court.  Moreover, each of the Individual Defendants, as Company officers and/or directors, has extensive contacts within this District.

## PARTIES

16.     Plaintiff Marcia Green is a current shareholder of Lawson.

17.     Plaintiff Austen Swaim is a current shareholder of Lawson.

18.     Defendant Lawson is a Delaware corporation and a global provider of business application software, maintenance, and consulting.  Lawson specializes in and targets specific industries through two reportable segments: S3 Industries, which targets customers in the healthcare,

services, and public sector industries, and M3 Industries, which targets customers in the equipment service management and rental, manufacturing and distribution, and consumer products industries. Lawson's software includes enterprise financial management, human capital management, business intelligence, asset management, enterprise performance management, supply chain management, service management, manufacturing operations, business project management, and industry-tailored applications.  Upon completion of the Proposed Acquisition, Lawson will become a wholly owned subsidiary of GGC.  Lawson's principal executive offices are located at 380 St. Peter Street, St. Paul, Minnesota.

19.     Defendant Harry Debes ("Debes") is Lawson's Chief Executive Officer ("CEO"), President, and a director and has been since June 2005.  In connection with the Proposed Acquisition, Debes entered into a Voting Agreement with GGC and Atlantis, pursuant to which he agreed to vote his shares in favor of the Proposed Acquisition and against any alternative proposal.

20.     Defendant H. Richard Lawson ("H. Lawson") is Lawson's Co-Chairman of the Board and has been since April 2006 and a director and has been since 1975.  H. Lawson was also Lawson's CEO from March 2000 to February 2001; President and Chief Operating Officer from October 1998 to March 2000; and Chairman of the Board from June 1996 to October 1998 and from February 2001 to April 2006.  H. Lawson is one of the founders of Lawson.  In connection with the Proposed Acquisition, H. Lawson entered into a Voting Agreement with GGC and Atlantis, pursuant to which he agreed to vote his shares in favor of the Proposed Acquisition and against any alternative proposal.

21.     Defendant Romesh Wadhwani ("Wadhwani") is Lawson's Co-Chairman of the Board and a director and has been since April 2006.  In connection with the Proposed Acquisition, Wadhwani entered into a Voting Agreement with GGC and Atlantis, pursuant to which he agreed to vote his shares in favor of the Proposed Acquisition and against any alternative proposal.

22.     Defendant David R. Hubers is a Lawson director and has been since April 2001.

23.     Defendant Michael A. Rocca is a Lawson director and has been since February 2003.

24.     Defendant Steven C. Chang is a Lawson director and has been since April 2006.

25.     Defendant Paul Wahl is a Lawson director and has been since April 2006.

26.     Defendant Peter Gyenes is a Lawson director and has been since May 2006.

27.     Defendant Robert A. Schriesheim is a Lawson director and has been since May 2006.

28.     Defendant GGC is a Delaware corporation and an affiliate of Golden Gate Capital and Infor.  GGC is also beneficially owned by affiliates of Golden Gate Capital.

29.     Defendant Atlantis is a Delaware Corporation and a wholly owned subsidiary of GGC.  Atlantis is also beneficially owned by affiliates of Golden Gate Capital.  Upon completion of the Proposed Acquisition, Atlantis will merge with and into Lawson and will cease its separate corporate existence.

30.     Defendant Golden Gate Capital is a California limited liability company and private equity investment firm with approximately $9 billion of capital under management.  Golden Gate Capital generates returns for investors through buyout and growth equity investments across a wide variety of industries.  Golden Gate Capital's principal executive offices are located at One Embarcadero Center, Suite 3900, San Francisco, California.

31.     Defendant Infor is a Georgia corporation and a provider of business application software and services with more than 8,000 employees and implementation and support capabilities in over 100 countries.  Infor's software portfolio includes products for customer relationship management, enterprise asset management, enterprise resource planning, financial management, human capital management, product lifecycle management, performance management, supply chain management, workforce management, and expense management.  Infor's principal executive offices are located at 13560 Morris Road, Suite 4100, Alpharetta, Georgia.

32.     The defendants named above in ¶¶19-27 are sometimes collectively referred to herein as the "Individual Defendants."

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

33.     Under Delaware law, in any situation where the directors of a publicly traded corporation undertake a transaction that will result in a change in corporate control, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the

corporation's shareholders, including a significant control premium.  This duty arises in at least the following three circumstances: (i) when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company; (ii) where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the break-up of the company; or (iii) when approval of a transaction results in a sale or change of control.  To diligently comply with these duties, neither the directors nor the officers may take any action that:

(a)      adversely affects the value provided to the corporation's shareholders;

(b)      will discourage, inhibit, or deter alternative offers to purchase control of the corporation or its assets;

(c)      contractually prohibits themselves from complying with their fiduciary duties;

(d)      will otherwise adversely affect their duty to secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e)      will provide the directors and/or officers with preferential treatment or benefits at the expense of, or separate from, the public shareholders.

34.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and officers of Lawson, are obligated under Delaware law to refrain from:

(a)      participating in any transaction where the directors' or officers' loyalties are divided;

(b)      participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)      unjustly enriching themselves at the expense or to the detriment of the public shareholders.

35.     Defendants, separately and together, in connection with the Proposed Acquisition, are knowingly or recklessly violating their fiduciary duties, and have aided and abetted such breaches, including their duties of loyalty, good faith, and due care owed to plaintiffs and the other public

shareholders of Lawson.  Individual Defendants are engaging in self-dealing, are obtaining for themselves personal benefits not shared equally by Lawson's public shareholders generally.  As a result of the Individual Defendants' self-dealing and divided loyalties, neither plaintiffs nor the Class (as defined herein) will receive adequate or fair value for their Lawson common stock in the Proposed Acquisition.

36.     The Individual Defendants have knowingly or recklessly breached their duties of loyalty, good faith, independence, and due care in connection with the Proposed Acquisition.  As such, the burden of proving the inherent or entire fairness of the Proposed Acquisition, including all aspects of its negotiation, structure, price, and terms, is placed upon defendants as a matter of law.

## THE UNFAIR ACQUISITION PROCESS

37.     A significant catalyst behind the Individual Defendant's decision to entertain acquisition offers in mid-2010 was Ichan's acquisition of approximately 8.54% of Lawson's common stock.  Icahn, a well known activist investor, filed a Schedule 13D with the SEC disclosing his ownership position on May 24, 2010.  At that time he also expressed his intention to meet with the Company's officers and directors to "discuss the business and operations of the [Company] and the maximization of shareholder value."  Fearful that Icahn may assert his power as a significant shareholder to oust management from their lucrative positions with the Company, the Individual Defendants hastily retained legal and financial advisors – Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") and Barclays respectively – to assist them in entering into the Proposed Acquisition whereby management will be able to retain their positions with the go-forward company.

38.     On June 4, 2010 – less than two weeks after Icahn's intentions concerning Lawson were made public – the Company received a letter from Infor indicating that Infor and Golden Gate Capital were interested in potentially acquiring Lawson for at least $9.25 to $10.25 per Company share if a shopping process was taking place, but they did not want to initiate such a process at that time.

39.     Infor reinitiated communications with Lawson in early 2011 for purposes of scheduling a meeting between the representatives of the two companies.  On January 11, 2011, Lawson provided Infor with a high-level overview of its business plan/strategy.  This meeting subsequently lead to the January 28, 2011 submission of a written offer from Infor and Golden Gate Capital to acquire the Company for $11 per share ("Initial Offer").

40.     On February 6, 2011, the Board determined that the Initial Offer did not reflect the full value of the Company.  This information was relayed to Infor and Golden Gate Capital and the parties subsequently held a meeting for purposes of exchanging additional information.

41.     On February 16, 2011, Infor and Golden Gate Capital submitted a revised written proposal to acquire Lawson for $11.25 per share ("Revised Offer").

42.     On February 17, 2011, the Lawson Board determined that the Revised Offer warranted further discussions with Infor and Golden Gate Capital.  The Board also determined that announcing the Company was for sale publicly was risky and should be avoided.  Accordingly, the Board authorized Barclays to privately contact seven specific entities to determine their potential interest in acquiring Lawson.  The Proxy fails to disclose the risks that warranted the lack of a public auction process or how the seven selected entities which Barclays were to contact were chosen.

43.     Lawson authorized commencement of the due diligence process with Infor and Golden Gate Capital immediately following the February 17, 2011 Board meeting.  Meanwhile, Barclays waited almost a week to reach out to the five strategic parties identified by the Board concerning their interest in an acquisition of the Company and waited almost two weeks before reaching out to the two private equity firms similarly identified.  This provided Infor and Golden Gate Capital – the Individual Defendant's preferred acquirer – to get a significant leg-up on any other potential bidder.  In fact, during that time representatives of Infor, Golden Gate Capital, Lawson, and each of their respective financial advisors attended numerous in-person meetings and conducted extensive discussions concerning the potential transaction.

44.     Of the seven entities contacted by Barclays per the Board's instruction, two indicated that they would look into whether a transaction with Lawson was something they were interested in.

- 10 -

One of these entities (Party A) was a strategic party and the other (Party B) was a private equity firm.

45.     On March 8, 2011, *Reuters*, citing unnamed sources, reported that Lawson had hired Barclays to explore a possible sale of the Company, speculating on various strategic and financial buyers as potential suitors.  The *Reuters* article disclosed that there were numerous strategic acquirers that would be interested in the Company's valuable assets and expertise, including tech giants Oracle, SAP, HP, IBM, and Microsoft.  Privately held rival Infor, which is owned by Golden Gate Capital, could also be interested, stated *Reuters*.

46.     Over the next three days, four additional financial parties and one additional strategic party contacted Barclays and/or Lawson to express their interest in acquiring the Company.  The four financial parties ultimately determined they were not interested.  The strategic party (Party C) subsequently began negotiating the terms of a confidentiality agreement with Lawson before indicating that it was not interested in pursuing an acquisition of the Company.  The Proxy fails to disclose why or when the four financial parties and Party C lost interest in pursuing a transaction with Lawson.

47.     On March 11, 2011, Lawson issued a press release confirming that it had received an unsolicited, non-binding proposal from Infor and Golden Gate Capital to acquire all of the Company's outstanding common stock at a price of $11.25 per share in cash.  The press release also confirmed that the Company had previously retained Barclays as its financial advisor to assist in evaluating the proposal.  Following issuance of this press release, Party B indicated to Lawson that it would not be interested in further pursuing a transaction of the Company.

48.     Also on March 11, 2011, Lawson met with Party A representatives.  Party A requested a follow-up call concerning certain technology related issues before it could determine its interest in acquiring the Company.  That discussion took place on March 14, 2011.

49.     Also on March 14, 2011, Infor and Golden Gate Capital's legal advisor delivered a draft merger agreement to Skadden which indicated for the first time that Infor and Golden Gate

Capital would require certain directors to enter into voting agreements concerning the proposed transaction.

50.     On March 20, 2011, Party A informed Barclays that it was not interested in pursuing an acquisition transaction with the Company.  The Proxy fails to disclose why Party A suddenly lost interest in pursuing a transaction with Lawson or how the two additional entities Barclays reached out to were chosen.

51.     From March 20 through April 13, 2011, Infor and Golden Gate Capital conducted due diligence and held numerous discussions with Lawson concerning, among other things, the merger agreement and its provisions, the debt commitment letter, the financing of the transaction, and the voting agreements.  During this time Barclays did not contact any other potential acquirers concerning their interest in acquiring the Company.

52.     On April 13, 2011, a financial party contacted Barclays expressing an interest in exploring an acquisition of the Company.  Barclays spoke with representatives of this entity on April 14, 2011, at which point the entity was no longer interested in a potential acquisition of Lawson. The Proxy fails to disclose why this entity suddenly lost interest in pursuing the transaction.

53.     From April 13 through April 25, 2011, Infor, Golden Gate Capital, and Lawson continued to negotiate the terms of the merger agreement and associated documents.  At no point during this period did Barclays or Lawson reach out to any additional parties concerning their interest in acquiring the Company nor did they reach out to any of the previously contacted entities.

54.     On April 25, 2011, the Board held a meeting with, among others, representatives of Barclays.  Barclays reviewed its financial analysis of the Proposed Acquisition and advised them that it would be issuing a fairness opinion in support of the $11.25 per share purchase price proposed by Infor and Golden Gate Capital.  This is far from surprising given that $13.2 million would be due to Barclays pursuant to its engagement with Lawson, but only if the merger is completed.

55.     On April 26, 2011, Infor, Golden Gate Capital, and Lawson executed the Merger Agreement and all related documents.  The Proposed Acquisition was announced that same day.

### THE PROPOSED ACQUISITION

56.     On April 26, 2011, Lawson issued the following press release announcing that the

Individual Defendants had agreed to sell Lawson to GGC:

> ST. PAUL, Minn., Apr 26, 2011 (BUSINESS WIRE) -- Lawson Software, Inc. (Nasdaq:LWSN) today announced that it has signed a definitive agreement to be acquired by GGC Software Holdings, Inc., an affiliate of Golden Gate Capital and Infor, in a transaction valued at approximately $2 billion. Under the terms of the merger agreement, stockholders of Lawson will receive $11.25 per share in cash. Lawson's board of directors unanimously approved the transaction and board members who collectively own approximately 9% of Lawson's outstanding shares have agreed to vote their shares in favor of the transaction.

> Today's announcement marks the culmination of the company's evaluation of strategic alternatives and review and negotiation of a proposal from Golden Gate and Infor that began prior to, and was later publicly confirmed in a press release on, March 11, 2011. During its evaluation, Lawson conducted a comprehensive market assessment and contacted other potential acquirers including competing global providers of enterprise applications and financial buyers, a process that did not result in a superior proposal. Following a thorough review and analysis of the strategic alternatives available to the company, Lawson's board determined that this merger transaction is in the best interests of stockholders.

> The transaction purchase price represents a valuation of approximately 2.5 times revenues, 12 times non-GAAP EBITDA and 23 times non-GAAP earnings per diluted share for the 12 months ended February 28, 2011. The $11.25 per share cash consideration represents a premium of approximately 14% to Lawson's closing share price on March 7, 2011, the last trading day prior to news reports speculating about a potential transaction involving the company, and a premium of approximately 35% to Lawson's average closing share price for the 52-week period prior to March 7, 2011. In addition, the purchase price represents a premium of approximately 28% to Lawson's closing share price on January 10, 2011, the date prior to Lawson entering into a non-disclosure agreement with Infor.

> "We are pleased to have entered into a transaction that will offer Lawson stockholders an attractive valuation," said Harry Debes, Lawson's president and chief executive officer. "After a thorough examination of the strategic alternatives available to the company as well as extensive discussions with Golden Gate and Infor, Lawson's board unanimously concluded that this transaction is in the best interests of the company and our stockholders."

> "On behalf of Lawson's board and management team, I would like to express our deep appreciation to our employees, whose passion and dedication have been key factors in making Lawson the great company it is today. We are also grateful to our customers and partners who have been instrumental in Lawson's growth and development over the years. We look forward to working closely with the Golden

- 13 -

Gate and Infor teams to ensure a smooth transition and complete the transaction as expeditiously as possible," continued Mr. Debes.

"Lawson is a natural strategic partner for Infor, offering complementary software solutions that will extend our existing portfolio, particularly in areas such as healthcare, public sector, manufacturing and human capital management," said Charles Phillips, CEO of Infor. "Lawson's and Infor's respective best-of-class solutions will enable us to expand our commitment to our customers, delivering comprehensive ERP suites. We look forward to working closely with the Lawson team to build upon our distinct core competencies to offer an enhanced product portfolio and customer service experience."

## FAILURE TO MAXIMIZE SHAREHOLDER VALUE

57.     The Proposed Acquisition significantly undervalues the Company and its future prospects. Lawson has demonstrated that it is well-positioned for growth. As the Company's target customers have begun investing heavily in information technology, the Company is in a powerful position to build on its customer base and the strength of its diverse industrial and geographical presence. Lawson's impressive and improving financial results also indicate that the Company is already beginning to reap the rewards of its business prospects and recent reorganization. Yet, the Individual Defendants have decided to sell now for an inadequate price via unfair process. As a result Lawson's public stockholders have been and will continue to be denied the fair process and arm's-length negotiated terms to which they are entitled in a sale of their Company. The consideration reflected in the Merger Agreement does not reflect the true inherent value of the Company that was known only to the Individual Defendants, as officers and directors of Lawson, and GGC at the time the Proposed Acquisition was announced.

58.     The consideration of $11.25 per Lawson share offered in the Proposed Acquisition represents an 8% discount to the $12.24 price at which Lawson's stock was trading prior to the announcement of the Proposed Acquisition on March 14, 2011. This March 14, 2011 trading price demonstrates the market's belief that the Company's fundamentals are worth more than Infor and Golden Gate Capital were offering. Further, even following the significant decline in Lawson's stock price engineered via defendants' premature March 11, 2011 announcement of a possible acquisition, the agreed-to consideration announced on March 11, 2011, still represented only a 14%

premium to the Company's $9.88 per share closing price on the day before the *Reuters* article speculating a deal was imminent.

59.     Prior the announcement of the Proposed Acquisition, Scott R. Berg ("Berg"), an analyst with Feltl and Company, had a price target of $12 per share on the Company's stock. Murphy, an analyst with Sidot & Company LLC, had a price target of $13 in February 2011. Murphy stated "[w]e think that management can maintain its operating margin improvement into F2013 by tuning up its underperforming M3 business and we introduce our F2013 EPS estimate of $0.57."

60.     But for the March 8, 2011 leak concerning a possible acquisition at $11.25 per share, the one day discount represented by the $11.25 per share consideration ultimately agreed to would have been far greater.  Stock analyst responses to the Proposed Acquisition confirm that the consideration offered in the Proposed Acquisition is grossly inadequate and that the premature March 8, 2011 announcement was designed to depress the Company's share value.  For example, Longbow Research analyst Steve Koenig speculated at the time that HP, Oracle, and SAP were companies that could make a competing bid for Lawson, stating "[t]here's a decent possibility there will be a higher bid for Lawson from another company or even from Infor."  Deutsche Bank analysts, Tom Ernst Jr. ("Ernst") and Stan Zlotsky ("Zlotsky") put a price target of $14 per share on the Company based on its third quarter revenue of $197.7 million being ahead of Wall Street's estimates.[1]  Ernst and Zlotsky also stated that Proposed Acquisition undervalued the Company based

---

[1] Lawson's third quarter financial results were released in the midst of the acquisition-related discussions.  These stellar results showed that profits grew about twelve times due to an increase in software revenues and one-time legal and tax events while operating margins reached an all-time high of 18.8%.  Profits for the quarter were $21.4 million, or $0.13 per share, up from $1.7 million, or $0.01 per share, from the same quarter a year ago.  Lawson credited the big increase on a 9% increase in software revenues, a $4.7 million decrease in the provision for income taxes, a gain of $3 million from the settlement of a bankruptcy claim against Lehman Brothers OTC Derivatives Inc., and a gain of $1.2 million related to the sale of marketable securities.  Defendant Debes lauded the Company's results, stating that "[t]he total value of software license contracts signed in the quarter grew by 27%, led by robust sales in our Healthcare vertical."

on the multiples and there was a good possibility that Oracle would present a competing take out offer. The analysts stated:

> In light of Infor's $11.25 bid and the possibility of Oracle presenting a competing take out offer, we transition our valuation methodology to multiple of enterprise value (EV) to trailing 12 months' (TTM) maintenance revenue. Our analysis of acquisitions over the last 10 years suggests deals have closed historically in the range of 6-9x EV/TTM. More recently, ARTG and Unica are representative acquisitions, at 7.5x and 6.1x, respectively. ARTG was purchased by Oracle, but had a higher growth profile, 14%, than Lawson's 10%. We believe that Oracle is a plausible strategic acquirer of Lawson that could pay at least 6x EV/TTM maintenance revenue, above Infor's 4.75x bid. Conservatively assuming 6x TTM maintenance multiple results in a $14 take out price.

61.     Berg, with Fetlt and Company, also speculated the Proposed Acquisition price was too low speculating that sale would come in the range of $13-$14 per share. Berg stated that the Company has "vast sales opportunities" within its S3 business segment. Berg went on to state: "We believe the company's 3Q results validate this thesis as the company reported continued S3 sales growth and recognized its highest ever non-GAAP [Generally Accepted Accounting Principles] margins. While we commend the company for its recent execution success, we downgraded the company's stock to a HOLD rating pending resolution of its potential sale as the company's recent stock run no longer offers a favorable risk/reward opportunity given our view that a sale would likely be between $13-$14 per share."

## THE PRECLUSIVE DEAL PROTECTION PROVISIONS

62.     On April 26, 2011, the Company filed a Form 8-K with the SEC wherein it disclosed the Merger Agreement. The Merger Agreement contained a number of provisions designed to prevent another bidder from making a superior proposal, thus effectively locking-up the deal in favor of GGC.

63.     Section 6.4 of the Merger Agreement contains a no-solicitation clause that prevents the Company from seeking a superior offer for its shareholders. It states that the Company shall not, and shall instruct and cause each of its subsidiaries and each company representative not to:

> (i) initiate, solicit, propose, knowingly encourage (including by providing information) or knowingly take any action to facilitate any inquiries or the making of

any proposal or offer that constitutes, or would reasonably be expected to lead to, an Acquisition Proposal;

(ii) other than informing Persons of the provisions contained in this Section 6.4, engage in, continue or otherwise participate in any discussions or negotiations regarding, or provide any non-public information or data concerning the Company or any Company Subsidiary to any Person relating to, any Acquisition Proposal or any proposal or offer that would reasonably be expected to lead to an Acquisition Proposal;

(iii) grant any waiver, amendment or release under any standstill or confidentiality agreement, the Rights Agreement or Takeover Statutes, or otherwise knowingly facilitate any effort or attempt by any Person to make an Acquisition Proposal (including providing consent or authorization to make an Acquisition Proposal to any officer or employee of the Company or to the Company Board (or any member thereof) pursuant to any confidentiality agreement); provided that nothing shall prevent the Company from taking any action otherwise prohibited by this Section 6.4(a)(iii) if the Company Board determines in good faith, after consultation with outside legal counsel, it would be reasonably likely to be inconsistent with the directors' fiduciary duties under applicable Laws not to do so to the extent required to allow any third party to make a non-public Acquisition Proposal to the Company Board;

(iv) approve, endorse, recommend, or execute or enter into any letter of intent, agreement in principle, merger agreement, acquisition agreement or other similar agreement relating to, an Acquisition Proposal or any proposal or offer that would reasonably be expected to lead to an Acquisition Proposal, or that requires the Company to abandon this Agreement; or

(v) resolve, propose or agree to do any of the foregoing.

64.     Though the Merger Agreement ostensibly has a "fiduciary out" provision that allows the Company to negotiate with other bidders, this provision is actually illusory.  In order to negotiate with any other suitors, the potential acquirer would first have to make an unsolicited written offer. Without access to non-public information, which the Company is prevented from offering under the Merger Agreement, no other bidder will emerge to make such an offer.

65.     Further discouraging superior offers, GGC is entitled to matching rights under the Merger Agreement.  Specifically, section 6.4 of the Merger Agreement states the following:

the Company shall have provided prior written notice to Parent at least four (4) Business Days in advance (the "Notice Period"), to the effect that (x) the Company Board has received a bona fide written Acquisition Proposal that is not withdrawn and that the Company Board concludes in good faith constitutes a Superior Proposal

- 17 -

and, absent any revision to the terms and conditions of this Agreement, the Company Board has resolved to effect a Company Adverse Recommendation Change and/or to terminate this Agreement pursuant to this Section 6.4(d), which notice shall specify the basis for such Company Adverse Recommendation Change or termination, including the identity of the party making the Superior Proposal and the material terms thereof, or (y) the Company Board believes that an Intervening Event has occurred, which notice shall include a reasonably detailed description of the Intervening Event, as applicable; and (B) prior to effecting such Company Adverse Recommendation Change, the Company shall, and shall cause its financial and legal advisors to, during the Notice Period, negotiate with Parent and the Parent Representatives in good faith (to the extent Parent desires to negotiate) to make such adjustments in the terms and conditions of this Agreement, so that (1) such Acquisition Proposal would cease to constitute a Superior Proposal, (2) the Intervening Event no longer requires a Company Adverse Recommendation Change, or (3) the Company Board no longer believes that the failure to effect a Company Adverse Recommendation Change would be reasonably likely to be inconsistent with its fiduciary duties under applicable Laws, as applicable; provided, that in the event of any material revisions to the Acquisition Proposal that the Company Board has determined to be a Superior Proposal, the Company shall be required to deliver a new written notice to Parent and to comply with the requirements of this Section 6.4(d) with respect to such new written notice; provided, further, that the Notice Period with respect to any new written notice delivered pursuant to the immediately preceding proviso shall be reduced from four (4) Business Days to two (2) Business Days.

66.      Pursuant to Section 8.2 of the Merger Agreement, Lawson must pay a $57.5 million termination fee if it receives a superior proposal and changes its recommendation for the Proposed Acquisition.  This provision ensures that no competing offer will be forthcoming.  The $57.5 million termination fee is 3.11% of the total equity value of the deal and equates to $0.35 per Lawson share that will be paid to GGC and its affiliates rather than the Company's shareholders if the Board changes its recommendation to accept a superior offer.  Moreover, Lawson will have to pay a termination fee of $75 million, or 4.06% of the equity value and the equivalent of $0.46 per share if the Proposed Acquisition is terminated because Lawson's Board adversely changes its recommendation to stockholders to vote in favor of the Proposed Acquisition due to an intervening event that was not reasonably foreseeable.  Additionally, under the Merger Agreement, Lawson may be required to pay GGC's expenses if the Merger Agreement is terminated under certain circumstances.

67.    These onerous and preclusive deal protection devices unreasonably deter and discourage superior offers from other interested parties, thus effectively ensuring that no competing offers will emerge for the Company so that the Individual Defendants can lock in their own personal benefits under the Proposed Acquisition.  The personal benefits to the Individual Defendants have caused them to shortchange Lawson shareholders by accepting the grossly inadequate proposed consideration. These defendants will reap the spoils of a transaction inherently unfair to the Company's common shareholders.

## THE MATERIALLY MISLEADING PROXY

68.    ***The Sales Process Leading to the Proposed Acquisition.***  In the Background of the Merger Section on pages 23 to 32 of the Proxy, it fails to disclose: (i) why the Board decided against actively soliciting other potential acquirors until after Infor and Golden Gate submitted a proposal the Board would be interested in pursuing; (ii) the criteria for selecting the five industry participants that Barclays would contact after February 17, 2011; (iii) why Barclays waited two weeks until March 2, 2011, to contact the two private equity parties; (iv) whether the four additional financial parties who contacted the Company between March 8, 2011 and March 10, 2011, were given access to non-public information concerning the Company and the reasons they gave for not pursuing a transaction with Lawson; and (v) why Party A indicated on March 20, 2011, that it was no longer interested in pursuing a transaction.  Without the information set forth above, shareholders are unable to determine the sufficiency of the process that led to the Proposed Acquisition and whether the Board took all steps to maximize shareholder value.

69.    In order to secure shareholder approval of this unfair deal, defendants filed the materially misleading Proxy with the SEC on May 31, 2011, and subsequently disseminated it to Lawson shareholders, it sets June 29, 2011, as the date for Lawson shareholders to vote on the Proposed Acquisition.  The Proxy, which recommends that Lawson's shareholders vote in favor of the Proposed Acquisition, omits and/or misrepresents material information about the unfair sale process, the unfair consideration, and the true intrinsic value of the Company.  Specifically the Proxy

- 19 -

omits/or misrepresents the material information set forth below in contravention of §14(a) and §20(a) of the Exchange Act and the Board's fiduciary duty of candor.

70.     ***Barclays's Present Value of Equity Research Analysts' 12-Month Price Targets.***  In Barclays's Present Value of Equity Research Analysts' 12-Month Price Targets descriptions on page 41of the Proxy, it fails to disclose: (i) the number of analysts whose price targets were observed by Barclays; and (ii) the inputs and assumptions used by Barclays to derive the estimated cost of equity used in its analysis.   Without the information set forth above, shareholders are unable to independently assess whether Barclays' Present Value of Equity Research Analysts' 12-Month Price Targets analysis is an adequate measure by which to evaluate the adequacy of the Proposed Acquisition before determining whether to vote for the transaction.

71.     ***Barclays's Selected Comparable Company Analysis.***  In the discussion of Barclays's Selected Comparable Company Analysis on pages 41 and 42 of the Proxy, it fails to disclose the set of forecasts which were used to derive the range of the implied price per share of Lawson found on page 42.  This information is material because without the information set forth above, shareholders are unable to independently assess whether the implied prices per share derived by Barclays as set forth in the Proxy are based on accurate projections concerning the Company's future prospects and are therefore relevant.  This is especially true given that financial forecasts are regularly updated to reflect newly acquired information.  Accordingly, shareholders are unable to independently assess whether Barclays's analysis, as set forth in the Proxy, is an adequate measure of this value assessment.

72.     ***Barclays's Discounted Equity Value Analysis.***  In the description of Barclays's Discounted Equity Value Analysis on page 42 of the Proxy, it fails to disclose: (i) why the chosen range of forward P/E multiples of 13.0x to 17.0x used differs from the forward P/E multiple range of 13.0x to 15.0x used in Barclay's Selected Comparable Company Analysis on pages 41 and 42 of the Proxy; (ii) the inputs and assumptions used by Barclays to derive the estimated cost of equity used in its analysis; and (iii) the implied range of equity values per Lawson share for CY2012 as derived under both the Street Estimates and Management Projections.  Without the information set forth

above, shareholders are unable to independently assess whether Barclays Discounted Equity Value Analysis is an adequate measure by which to evaluate the Proposed Acquisition before determining whether to vote for the transaction.  Moreover, this information is relevant for purposes of allowing shareholders to determine the consistency of the various analyses performed by Barclays and, in turn, what weight, if any, to place on Barclays's fairness opinion.

73.     ***Barclays's Discounted Cash Flow Analysis.***  In the description of Barclays's Discounted Cash Flow Analysis on page 43 of the Proxy, it fails to disclose: (i) the basis for Barclays's 2016 forecast of free cash flows given that management projections appear to end in 2015; (ii) the inputs and assumptions used by Barclays to derive the range of perpetuity growth rates used in its analysis; and (iii) the inputs and assumptions used by Barclays to derive the range of discount rates used in its analysis.  Because the Discounted Cash Flow Analysis is very sensitive to its inputs, specifically the perpetuity growth rates and discount rates selected, this information is critical to shareholders' understanding of how the analysis was performed, whether that analysis was performed properly, and in turn, what weight, if any, to place on Barclays Discounted Cash Flow Analysis (and its fairness opinion generally) when determining whether to vote for the transaction.

74.     ***Barclays's Leveraged Acquisition Analysis.***  In the description of Barclays's Leveraged Acquisition Analysis on pages 43 and 44 of the Proxy, it fails to disclose: (i) the rationale behind Barclays's selection of a total debt/FY2011E EBITDAS multiple of 6.5x, a forward EBITDAS exit multiple of 10.0x, and a required IRR of 20%-25% for its analysis; (ii) why management's estimates were not incorporated into Barclays's Leveraged Acquisition Analysis and the results of that analysis if such estimates were used; and (iii) the assumed cost of debt used by Barclays.  Without the information set forth above, shareholders are unable to independently assess whether Barclays's Leveraged Acquisition Analysis is an adequate measure by which to evaluate the Proposed Acquisition before determining whether to vote for the transaction.

75.     ***Barclays's Selected Precedent Transactions Analysis.***  In the description of Barclays's Selected Precedent Transactions Analysis on pages 44 and 45 of the Proxy, it fails to disclose: (i) the financial metrics for each of the selected precedent transactions; (ii) the EV/FTM

Revenue and EV/FTM EBITDAS multiples for each of the selected precedent transactions; and (iii) the set of forecasts Barclays used to derive the range of implied prices per Lawson share found on page 45. Without the information set forth above, shareholders are unable to independently assess whether Barclays's analysis, as set forth in the Proxy, is an adequate measure of this value assessment.

76. ***The Specific Services Barclays Has Provided to Lawson, or Its Affiliates, and the Amount of Compensation Received for Those Services by Barclays in the Last Two Years***. The Proxy fails to disclose the specific investment banking services Barclays has provided to Lawson, or its affiliates, and the compensation paid by Lawson to Barclays for those services over the past two years. The failure to disclose this information prevents the shareholders from properly considering whether Barclays was conflicted by having a prior relationship with Lawson and its Board which would compromise its ability to act independently. This information is vital for Lawson shareholders to determine if Barclays's objectivity may have been compromised, and in turn, what weight, if any, to place on Barclays's fairness opinion.

77. ***The Specific Services Barclays Has Provided to Golden Gate Capital, or Its Affiliates, in the Last Two Years.*** The Proxy fails to disclose the specific services Barclays has rendered on behalf of Golden Gate Capital over the last two years in exchange for $7.8 million. The failure to disclose this information prevents the shareholders from properly considering whether Barclays was conflicted by virtue of having a greater financial interest to favor Golden Gate Capital in the transaction based on their past dealings. This information is vital for Lawson shareholders to determine if Barclays's objectivity may have been compromised, and in turn, what weight, if any, to place on Barclays's fairness opinion.

78. ***Certain Financial Projections Provided by Lawson to Barclays.*** The Proxy fails to disclose the following financial projections for fiscal years 2011-2016 which were provided by Lawson to Barclays for use in its analyses: (i) EBIT (or amortization); (ii) Taxes (or tax rate); (iii) Capital Expenditures; (iv) Changes in working capital; and (v) Unlevered Free Cash Flows. These projections represent Lawson management's best estimates of the Company's future financial

performance.  The omission of these projections renders it impossible for Lawson shareholders to compare the Proposed Acquisition with the Company's prospects should it remain independent, and determine which alternative is more favorable.  In addition, without this information, Lawson shareholders are unable to independently assess whether Barclays's analyses set forth in the Proxy, which rely on these projections, adequately assesses the Proposed Acquisition, and in turn, what weight, if any, to place on Barclays's fairness opinion.

79.     The Individual Defendants were aware of their duty to disclose the foregoing material information in the Proxy, and acted with at least negligence in failing to ensure that this material information was disclosed.  Absent disclosure of this material information, shareholders are unable to make an informed decision about whether to vote in favor of the Proposed Acquisition, and are, thus, threatened with irreparable harm warranting injunctive relief.

## THE UNFAIR AND INADEQUATE PROCESS

80.     In order to meet their fiduciary duties, the Individual Defendants are obligated to explore transactions that will maximize shareholder value, and not structure a preferential deal for themselves.  Due to the Individual Defendants' eagerness to enter into a transaction with GGC, they failed to implement a process to obtain the maximum value for Lawson shareholders.

81.     As a result of defendants' conduct, Lawson's public stockholders have been and will continue to be denied the fair process and arm's-length negotiated terms to which they are entitled in a sale of their Company.  The consideration reflected in the Proposed Acquisition does not reflect the true inherent value of the Company that was known only to the Individual Defendants, as directors and officers of Lawson, and GGC at the time the Proposed Acquisition was announced.

## SELF-DEALING

82.     Because the Individual Defendants dominate and control the business and corporate affairs of Lawson and have access to material, non-public information concerning Lawson's financial condition and business prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Lawson.  Therefore, it is inherently unfair for the Individual Defendants to execute and pursue any merger or acquisition under which

they will reap disproportionate benefits to the exclusion of obtaining the best shareholder value reasonably available. Nonetheless, the Proposed Acquisition represents an effort by the Individual Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of the Class by denying the Class members their shareholders rights by selling Lawson via an unfair process and at an inadequate price. Accordingly, the Proposed Acquisition will benefit the Individual Defendants at the expense of Lawson's shareholders.

83.     Instead of attempting to negotiate an agreement reflecting the best consideration reasonably available for the Lawson shareholders who they are duty-bound to serve, the Individual Defendants disloyally placed their own interests first, and tailored the terms and conditions of the Proposed Acquisition to meet their own personal needs and objectives by agreeing to sell the Company to a private entity that will likely retain current Lawson management going forward.[2] Moreover, these benefits are being derived at a time when the Individual Defendants' positions at Lawson were potentially in jeopardy given Ichan's recent acquisition of over 10% of the Company's stock.

84.     Worse, as the following chart reflects, a majority of the Board is set to receive a substantial cash windfall in the form of options and restricted stock that will immediately vest upon consummation of the Proposed Acquisition. In addition, defendant Debes is in line to receive a massive change-in-control cash payout should his employment not continue with the post-Proposed Acquisition company. Indeed, for seven of the nine members of the Board, the personal financial benefits they negotiated for themselves in the Proposed Acquisition far exceed the added value they would be set to receive if they had negotiated for a higher price. Thus, the members of the Board were set to obtain lucrative benefits by agreeing to the Proposed Acquisition (even at an inadequate price) and likewise had little personal financial incentive to fulfill their fiduciary obligations.

---

[2] Section 2.6 of the Merger Agreement provides that the officers and directors of the Company will continue to act as corporate officers and directors of the go-forward entity immediately following consummation of the Proposed Acquisition.

Accordingly, they agreed to the Proposed Acquisition to the detriment of the Company's shareholders.

| Potential Benefits to Insiders from Higher Sale Price Per Share Compared to Acceleration | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Ownership as of 4/26/11 | **Debes** | **Lawson** | **Wadhwani** | **Hubers** | **Rocca** | **Chang** | **Wahl** | **Gyenes** | **Schriesheim** |
| *Value at prices:* | | | | | | | | | |
| $11.25 | $26,834,421 | $107,187,930 | $55,697,591 | $1,445,325 | $1,040,893 | $873,759 | $734,043 | $734,043 | $239,408 |
| $11.50 | $28,063,476 | $109,569,884 | $56,935,316 | $1,503,925 | $1,093,243 | $915,749 | $772,643 | $772,643 | $254,633 |
| $11.75 | $29,292,530 | $111,951,838 | $58,173,040 | $1,562,525 | $1,145,593 | $957,738 | $811,243 | $811,243 | $269,858 |
| $12.00 | $30,521,584 | $114,333,792 | $59,410,764 | $1,621,125 | $1,197,943 | $999,727 | $849,843 | $849,843 | $285,083 |
| $12.25 | $31,750,638 | $116,715,746 | $60,648,488 | $1,679,725 | $1,250,293 | $1,041,716 | $888,443 | $888,443 | $300,308 |
| **Added value** | | | | | | | | | |
| *$11.25 vs. $12.25* | $4,916,217 | $9,527,816 | $4,950,897 | $234,400 | $209,400 | $167,957 | $154,400 | $154,400 | $60,900 |
| *Value of Acceleration* | | | | | | | | | |
| *(plus Golden Parachute)* | $13,018,614 | $0 | $0 | $369,000 | $369,000 | $369,000 | $369,000 | $369,000 | $87,750 |

85.     In light of the foregoing, the Individual Defendants must, as their fiduciary obligations require:

- Withdraw their consent to the acquisition of Lawson and allow the shares to trade freely - without impediments, including the termination fee, matching rights, and voting agreement;

- Act independently so that the interests of Lawson's public stockholders will be protected;

- Adequately ensure that no conflicts of interest exist between defendants' own interests and their fiduciary obligation to maximize stockholder value or, if such conflicts exist, to ensure that all conflicts be resolved in the best interests of Lawson's public stockholders; and

- Solicit competing bids to GGC and its affiliates offer to ensure that the Company's shareholders are receiving the maximum value for their shares.

The Individual Defendants have also approved the Proposed Acquisition so that it transfers 100% of Lawson's revenues and profits to GGC, thus, all of Lawson's operations will now accrue to the benefit of GGC.

## CLASS ACTION ALLEGATIONS

86.     Plaintiffs bring this action for themselves and on behalf of all holders of Lawson common stock which have been or will be harmed by the conduct described herein (the "Class"). Excluded from the Class are the defendants and any individual or entity affiliated with any defendant.

87.     This action is properly maintainable as a class action.

88.     The Class is so numerous that joinder of all members is impracticable.  According to the Proxy, there were over 164.3 million shares of Lawson common stock outstanding as of April 15, 2011.

89.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, inter alia, the following:

(a)     whether the Proxy contains material misstatements or omissions in violation of §14(a) and §20(a) of the Exchange Act;

(b)     whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, candor, or due care with respect to plaintiffs and the other members of the Class in connection with the Proposed Acquisition;

(c)     whether the Individual Defendants have breached their fiduciary duty of candor to plaintiffs and the other members of the Class in connection with the Proposed Acquisition by soliciting shareholder vote in favor of the Proposed Acquisition based upon inadequate disclosures;

(d)     whether the Individual Defendants have breached any of their other fiduciary duties owed to plaintiffs and the other members of the Class in connection with the Proposed Acquisition, including the duties of good faith, diligence, honesty, and fair dealing;

(e)     whether Lawson, GGC, Atlantis, Golden Gate Capital, and/or Infor aided and abetted the Individual Defendants' breaches of fiduciary duties;

(f)      whether the Individual Defendants are engaging in self-dealing in connection with the Proposed Acquisition;

(g)      whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets; and

(h)      whether plaintiffs and the other members of the Class would suffer irreparable injury were the transactions complained of herein consummated.

90.      Plaintiffs' claims are typical of the claims of the other members of the Class and plaintiffs do not have any interests adverse to the Class.

91.      Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately represent and protect the interests of the Class.

92.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

93.      Plaintiffs anticipate that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

94.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

**Against the Individual Defendants, Lawson, and GGC for Violations of
§14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder**

95.      Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

- 27 -

96.     Individual Defendants, Lawson, and GGC disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

97.     The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants, Lawson, and GGC.  It misrepresented and/or omitted material facts, including material information about the actual intrinsic value of the Company's assets.

98.     In so doing, the Individual Defendants, Lawson, and GGC made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  By virtue of their positions within the Company, the Individual Defendants, Lawson, and GGC were aware of this information and of their duty to disclose this information in the Proxy.

99.     The Individual Defendants, Lawson, and GGC were at least negligent in filing the Proxy with these materially false and misleading statements.

100.    The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Acquisition.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

101.    By reason of the foregoing, the Individual Defendants, Lawson, and GGC have violated §14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

102.    Because of the false and misleading statements in the Proxy, plaintiffs are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Against the Individual Defendants and Lawson for
### Violation of §20(a) of the Exchange Act

103.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

104.    The Individual Defendants acted as controlling persons of Lawson within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Lawson, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.

105.    Each of the Individual Defendants and Lawson was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

106.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Acquisition.  They were, thus, directly involved in the making of this document.

107.    Lawson also had direct supervisory control over composition of the Proxy and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy.  Lawson, in fact, disseminated the Proxy and is, thus, directly responsible for materially misleading shareholders because it permitted the materially misleading Proxy to be published to shareholders.

- 29 -

108.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants and Lawson were each involved in negotiating, reviewing, and approving the Proposed Acquisition.  The Proxy purports to describe the various issues and information that they reviewed and considered, descriptions of which had input from both the directors and Lawson.

109.    By virtue of the foregoing, the Individual Defendants and Lawson have violated §20(a) of the Exchange Act.

110.    As set forth above, the Individual Defendants and Lawson had the ability to exercise control over and did control a person or persons who have each violated §14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of defendants' conduct, Lawson will be irreparably harmed.

### COUNT III

### Claim for Breach of Fiduciary Duties Against the Individual Defendants

111.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

112.    The Individual Defendants have violated the fiduciary duties of care, loyalty, good faith, and independence owed to the public shareholders of Lawson and have acted to put their personal interests ahead of the interests of Lawson's shareholders.

113.    By the acts, transactions, and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive plaintiffs and other members of the Class of the true value inherent in and arising from Lawson.

114.    The Individual Defendants have violated their fiduciary duties by entering Lawson into the Proposed Acquisition without regard to the effect of the Proposed Acquisition on Lawson's shareholders.

115.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, and independence owed to the shareholders of Lawson because, among other reasons:

  (a)  they failed to take steps to maximize the value of Lawson to its public shareholders;

  (b)  they failed to properly value Lawson and its various assets and operations; and

  (c)  they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Proposed Acquisition.

116. Because the Individual Defendants dominate and control the business and corporate affairs of Lawson, and are in possession of or have access to private corporate information concerning Lawson's assets, business, and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Lawson which makes it inherently unfair for them to pursue and recommend any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing shareholder value.

117. By reason of the foregoing acts, practices, and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward plaintiff and the other members of the Class.

118. The Individual Defendants are engaging in self-dealing, are not acting in good faith toward plaintiffs and the other members of the Class, and have breached and are breaching their fiduciary duties to the members of the Class.

119. As a result of the Individual Defendants' unlawful actions, plaintiffs and the other members of the Class will be irreparably harmed in that they will not receive their fair portion of the value of Lawson's assets and operations.  Unless the Proposed Acquisition is enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to plaintiffs and the members of the Class, will not engage in arm's-length negotiations on the Proposed Acquisition terms, and may consummate the Proposed Acquisition, all to the irreparable harm of the members of the Class.

120. Plaintiffs and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can plaintiffs and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT IV

### Claim for Aiding and Abetting Breaches of Fiduciary Duty Against Lawson

121.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

122.    The Individual Defendants owed to plaintiffs and the members of the Class certain fiduciary duties as fully set out herein.

123.    By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to plaintiffs and the members of the Class.

124.    Lawson colluded in or aided and abetted the Individual Defendants' breaches of fiduciary duties, and was an active and knowing participant in the Individual Defendants' breaches of fiduciary duties owed to plaintiffs and the members of the Class.

125.    Plaintiffs and the members of the Class shall be irreparably injured as a direct and proximate result of the aforementioned acts.

## COUNT V

### Claim for Aiding and Abetting Breaches of Fiduciary Duty Against GGC, Atlantis, Golden Gate Capital, and Infor

126.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

127.    The Individual Defendants owed to plaintiffs and the members of the Class certain fiduciary duties as fully set out herein.

128.    By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to plaintiffs and the members of the Class.

129.    Defendants GGC, Atlantis, Golden Gate Capital, and Infor colluded in or aided and abetted the Individual Defendants' breaches of fiduciary duties, and were active and knowing participants in the Individual Defendants' breaches of fiduciary duties owed to plaintiffs and the members of the Class.

130.   Defendants GGC, Atlantis, Golden Gate Capital, and Infor participated in the breach of the fiduciary duties by the Individual Defendants for the purpose of advancing their own interests. Defendants GGC, Atlantis, Golden Gate Capital, and Infor obtained and will obtain both direct and indirect benefits from colluding in or aiding and abetting the Individual Defendants' breaches. Defendants GGC, Atlantis, Golden Gate Capital, and Infor will benefit, inter alia, from the acquisition of the Company at an inadequate and unfair price if the Proposed Acquisition is consummated.

131.   Plaintiffs and the members of the Class shall be irreparably injured as a direct and proximate result of the aforementioned acts.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs demand injunctive relief, in their favor and in favor of the Class and against defendants as follows:

A.   Declaring that this action is properly maintainable as a class action;

B.   Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

C.   Rescinding, to the extent already implemented, the Merger Agreement;

D.   Enjoining defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until the Company (i) adopts and implements a procedure or process reasonably designed to provide the best possible value for shareholders; and (ii) amends the Proxy so as to provide Lawson shareholders with all material information concerning the Proposed Acquisition as required by the Exchange Act;

E.   Directing the Individual Defendants to exercise their fiduciary duties to commence a sale process that is reasonably designed to secure the best possible consideration for Lawson and obtain a transaction which is in the best interests of Lawson's shareholders;

F.   Imposition of a constructive trust, in favor of plaintiffs and members of the Class, upon any benefits improperly received by defendants as a result of their wrongful conduct;

G.     Awarding plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

H.     Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: June 7, 2011                    ANDERSON, HELGEN, DAVIS &
                                          NISSEN, PA

                                       s/Henry M. Helgen
                                       Henry M. Helgen III (Attorney No. 151075)
                                       150 South Fifth Street, Suite 3100
                                       Minneapolis, MN 55402
                                       Telephone: (612) 435-6363
                                       Facsimile:  (612) 435-6379

                                       ROBBINS UMEDA LLP
                                       BRIAN J. ROBBINS
                                       STEPHEN J. ODDO
                                       ARSHAN AMIRI
                                       JUSTIN D. RIEGER
                                       600 B Street, Suite 1900
                                       San Diego, CA 92101
                                       Telephone: (619) 525-3990
                                       Facsimile:  (619) 525-3991

                                       KENDALL LAW GROUP, LLP
                                       JOE KENDALL
                                       JAMIE J. MCKEY
                                       3232 McKinney, Suite 700
                                       Dallas, TX 75204
                                       Telephone: (214) 744-3000
                                       Facsimile:  (214) 744-3015

                                       Attorneys for Plaintiff

612250